Judge Coughenour

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

GLEN SCOTT MILNER,

                Plaintiff,

        v.

UNITED STATES DEPARTMENT OF THE
NAVY,

               Defendant.

No. CV-06-01301-JCC

UNITED STATES' MOTION FOR
SUMMARY JUDGMENT

Note for May 11, 2007

Oral Argument Requested

    Defendant United States Department of the Navy (the "Navy") hereby moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the grounds that there are no genuine issues of material fact and defendant is entitled to judgment as a matter of law. This Motion is based on the legal authorities and argument contained herein, the attached Declarations of Commander George N. T. Whitbred IV (the "Whitbred Declaration" at Ex. 1), and of Anthony J. Robinson (the "Robinson Declaration" at Ex. 2), the two attached maps of the Naval Magazine Indian Island and the surrounding community (Ex. 3 and Ex. 4), the administrative record filed in paper form with the Court, the other pleadings filed in this case, and any oral argument the Court may wish to entertain.

United States' Motion for
Summary Judgment – 1
(CV-06-01301-JCC)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON  98101-1271
(206) 553-7970

**INTRODUCTION**

Over the last 25 years, Plaintiff Glen Scott Milner ("Milner") has filed with the Navy many hundreds of requests under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, invariably seeking sensitive information about the Navy's operations in the Puget Sound region. The Navy, which adheres to the principle of open government, has generally attempted to accommodate Milner's requests, providing him with extensive documentation. The Navy has sought to withhold information only when the requested information is so sensitive that its disclosure would risk the lives and physical safety of Navy personnel and the general public, would reveal law enforcement techniques, procedures and guidelines, or would threaten the security of the United States' or surrounding communities. The withholding of such sensitive information, of course, is permitted by FOIA Exemptions 1, 2, 3 and 7. See 5 U.S.C. §§ 552(b)(1), (2), (3), and (7).

This case fits the typical Milner pattern. Milner seeks information regarding explosive safety studies prepared with respect to the Naval Magazine Indian Island. In particular, Milner seeks access to a highly sensitive analysis known as Explosive Safety Quantity Distance arcs ("ESQD Arcs"). As is set forth in the Whitbred Declaration, Navy experts believe that the release of such ESQD Arcs pertaining to Naval Magazine Indian Island arsenal would disclose the location and quantity of dangerous explosives, ordnance or ammunition, which in turn would permit terrorists, and other persons of ill-will, to threaten the security of the base, and place in jeopardy the safety of base personnel and the surrounding community. Milner, on the other hand, insists not only on obtaining copies of the ESQD Arcs, but fully intends to publish them on the Internet – irrespective of the risks such publication might pose to the security of Armed Forces personnel and the safety of the surrounding community.[1]

The Navy believes that this is a case where the right of citizens to "know what their government is up to," is outweighed by the practical need to protect the security of a military

---

[1] Milner has made no secret of his ultimate goal – the removal of the Naval presence in the Puget Sound area, and, in particular, removal of nuclear weapons from the area. See http://www.gzcenter.org/. The motivations of a requestor in making a FOIA request, of course, are irrelevant to the question whether the documents in question are subject to the FOIA.

1  arsenal and the safety of the surrounding civilian community.  As such, the government

2  respectfully submits that the documents requested by Milner are protected from disclosure under

3  FOIA Exemptions 7(F) and 2.[2]  5 U.S.C. §§ 552(b)(7)(F) and (b)(2).

4  ## ADMINISTRATIVE HISTORY

5  *The Processing of Milner's FOIA Requests:*

6      On December 7, 2003, in a letter directed to the Commanding Officer, Naval Magazine

7  Indian Island, and again on February 3, 2004, in a second letter directed to the Ordnance Safety

8  and Security Activity, Milner submitted two substantially identical FOIA requests seeking:

9          All documents on file regarding Explosive Safety Quantity Distance
           (ESQD) arcs or explosive handling zones at the ammunition depot at Naval
10         Magazine Indian Island.  This would include all documents showing
           impacts or potential impacts in the explosive handling zones to the
11         ammunition depot and the surrounding areas.

12         [A]ll maps and diagrams of the ammunition depot at Indian Island which
           would show ESQD arcs or explosive handling zones; and
13

14         [All] documents regarding any safety instructions or operating procedures
           for Navy or civilian maritime traffic within or near the explosive handling
15         zones or ESQD arcs at the ammunition depot at Indian Island.

16  Robinson Dec. ¶¶ 4, 5, 48; Administrative Record, Tabs 1 and 53.

17      In response, the Commanding Officer, Naval Magazine Indian Island, identified a total of

18  17 document packages (totaling approximately 1000 pages) which he believed were responsive

19  to Milner's FOIA request.  Robinson Dec. at ¶ 21.  These 17 document packages were submitted

20  to Navy General Counsel (the FOIA administrative appellate authority for Naval Magazine

21  Indian Island), with a request that sensitive explosive safety information be withheld from the

22  document packages to protect the security of the base.  Robinson Dec. at ¶ 7.  The General

23  Counsel requested the opinion of the Naval Criminal Investigative Service regarding whether the

24  materials were compiled for law enforcement purposes, the disclosure of which "could

25  reasonably be expected to endanger the life or physical safety of any individual."  Robinson Dec.

26  at ¶ 24; see, generally, 5 U.S.C. 552(b)(7)(F).  In response, the Naval Criminal Investigative

27

28      [2] One additional document package is also protected by Exemption Three, 5 U.S.C. § 552(b)(3), because its
disclosure would violate the export control laws of the United States.  The Navy understands that this document
is not in dispute between the parties, and accordingly has refrained from briefing the issue.

United States' Motion for
Summary Judgment  –  3
(CV-06-01301-JCC)

1    Service agreed that the disclosure of the information implicated law enforcement and public

2    safety concerns.  Id.  Thereafter, the General Counsel also solicited the views of several other

3    experts at various Navy activities around the country as to different portions of the 15 document

4    packages.  These consultations took place over the course of nearly three years, and resulted in

5    several different administrative appeals.  Robinson Dec. at ¶ 22.  The Navy ultimately

6    determined that certain of the documents could be released in their entirety and others could be

7    released in redacted form.[3]  However, there was broad consensus among the Navy experts that

8    the actual ESQD Arcs should not be disclosed – that the release of these documents would

9    present far too large a risk to security to be justified by the principle of open government.  See

10   generally, Whitbred Declaration.

11        In his Complaint, Milner spends considerable time complaining about the Navy's tortuous

12   and lengthy administrative process.  Complaint at ¶¶ 13-36.  The Navy does not dispute that the

13   administrative process in this case may have been unnecessarily lengthy and complicated.[4]

14   Nevertheless, the lengthy administrative process ultimately resulted in the release to Milner of

15   more documents than otherwise would have been the case.  See Robinson Dec. at ¶¶ 32, 38, 42,

16   43, 46.  Furthermore, there is no dispute now between the parties that Milner has exhausted his

17   administrative remedies,[5] that all responsive documents have been identified, and that they have

18   been adequately identified in the government's *Vaughn Index*.  See pp. 12-26 of the Robinson

19   Declaration.  See generally, Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973).  The only question

20   remaining for this Court is the one that ultimately matters, whether the documents listed in the

21

22   [3]  The Freedom of Information Act requires that any "reasonably segregable portion of a record shall be
     provided to any person requesting such record after deletion of portions which are exempt."  5 USC §552(b).

23   Accordingly, the Navy has redacted the records which it determined to be responsive to Milner's request and
     provided him with all reasonably segregable non-exempt portions of responsive information.  Church of

24   Scientology v. Department of the Army, 611 F.2d 738, 744 (9th Cir. 1979).  See Holland v. CIA, 1992 WL
     233820 at 11 (D.D.C. Aug. 31, 1992) (finding "sufficient showing of good faith" by agency in segregating

25   exempt from non-exempt information, based on review of declarations, together with examination of redacted
     documents and fact that subsequent releases were made during litigation.)

26

27   [4]  A complete summary of the administrative process is contained in the Robinson Declaration at pp 1 - 12.

28   [5]  Milner was at all times free to seek relief in this Court.  Under Section (a)(6) of the FOIA, a requestor is
     deemed to have exhausted his administrative remedies if the agency fails to make a decision within 20 days of an
     initial FOIA request or within 20 days of an appeal. 5 U.S.C. § 522(a)(A) and (C).

United States' Motion for                                    UNITED STATES ATTORNEY
Summary Judgment  –  4                                       700 STEWART STREET, SUITE 5220
(CV-06-01301-JCC)                                            SEATTLE, WASHINGTON  98101-1271
                                                             (206) 553-7970

*Vaughn* Index are covered by FOIA Exemptions 7(F) and 2.  In a FOIA case, the Court does not review the quality of the agency's administrative process based on the "arbitrary and capricious" standard of the Administrative Procedure Act.  FOIA cases are to be determined by the Court *de novo*, based on the nature of the withheld documents themselves.  5 U.S.C. § 552(a)(4)(B); Lewis v. Department of Labor, 419 F.3d 970, 977 (9th Cir. 2005) ("Review of agency access decisions under FOIA and the Privacy Act is *de novo*, requiring no deference to the agency's determination or rationale regarding disclosures.")

*Factual Analysis of ESQD Arcs for Naval Magazine Indian Island:*

In order to properly understand the factual issues in this case, the government would strongly urge the Court to review the Whitbred Declaration, where the base Commander for Naval Magazine Indian Island explains in detail why he believes the ESQD Arcs for the arsenal are too sensitive to be released to the public.  Commander Whitbred explains that in general, ESQD Arcs are measurements of the effects of an explosion at varying distances, and, as such, define minimum separation distances for various quantities of explosives based on required degrees of protection.  The separation distances identified by the ESQD Arcs are then used to establish a reasonable level of safety with respect to Navy shore activities, as well as appropriate levels of protection for adjacent public and private property.  ESQD Arcs are accordingly prepared based on the degree of protection needed, the type and amount of explosive material involved, the segregation of these materials, their explosive effects and what are permissible exposures given the risk involved.  ESQD Arcs are then in turn used to design, array, and construct ammunition storage facilities, and to organize operations with respect to handing of the ammunition to minimize risk and maximize safety.  Whitbred Dec. at ¶¶ 9 and 10.

Whitbread explains that if the ESQD Arcs for Naval Arsenal Indian Island were released, they would constitute a blueprint for a terrorist or other potential adversary planning to attack the arsenal.  He writes that armed with this information, a lay person with a rudimentary knowledge of mathematics could easy determine:

United States' Motion for
Summary Judgment – 5
(CV-06-01301-JCC)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1.  The precise location of ordinance magazines;

2.  The types of items stored in them;

3.  Which locations to target for maximum damage to personnel, critical infrastructure and disruption of loading and off-loading of ships;

4.  The mission capability of the installation;

5.  The installation's battle group capacity and operational sustainability;

6.  The location of personnel and the precise numbers of personnel required to load and off-load a ship; and

7.  The quantities of materials stored there.

Whitbred Dec. at ¶ 8.

Commander Whitbred goes on to explain that although ESQD Arcs are designed to be part of the Navy's explosives safety program – that is to protect property and people from harm that could occur from an incident, accident or breach of security – in the wrong hands ESQD Arcs can be used for exactly the opposite purpose – to harm persons or property or to threaten the security of the installation, and the safety of personnel on the installation and in nearby communities.  Whitbred Dec. at ¶ 9.  He explains how this information could be used to determine the precise location and quantity of ordnance magazines, as well as the types of items stored in them; and would allow a person of ill-will to target the precise locations which would cause maximum damage to personnel and critical infrastructure, and thus inflict the greatest possible destruction to life and property.  Id.  Whitbred states that part of his duty as base commander is to safeguard exactly the types of sensitive information which could be used to create a security breach.  He states as follows:

> It is because of the varying nature of this potential threat, we are particularly careful to scrutinize requests of ESQD arc information or arc maps and make determinations regarding the release of such information on a case-by-case basis ... we do not release this type of information to the public, if (such a) release (would pose) any threat of death or injury to any person - either inside or outside the installation boundaries.

Whitbred Dec. at ¶ 12.

United States' Motion for
Summary Judgment – 6
(CV-06-01301-JCC)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1    Commander Whitbred explains that while he is aware that in the past ESQD Arcs may have

2    been released for Trident submarine bases at Kings Bay, Georgia and Bangor, Washington,

3    "Naval Magazine Indian Island is not a submarine base.  The nature of its mission is completely

4    different, as are its security parameters and physical characteristics."  Whitbred Dec. at ¶ 14.

5    One difference is that the security parameters for a Trident submarine base include airspace

6    which is restricted as a matter of law.  See, e.g., 14 C.F.R. § 73.93 (Establishing restricted

7    airspace over Bangor, WA).  By contrast, Whitbred explains:

8           Naval Magazine Indian Island is not a single weapon-system facility,
            such as [a submarine base].  Naval Magazine Indian Island is a depot
9           for multiple weapons, weapons components, ammunition and
            explosives. [At the arsenal,] the items arrive and depart daily by
10          truck and ship. . . .We store/move explosives and ammunition for all
            the military services, allied forces, Homeland Security and other
11          federal agencies.  We have even store commercial explosives, such
            as blasting agent, when it is determined that movement through a
12          military base is safer than through a commercial port.  Thus, the mix
            of explosives and ammunition types and the amounts held at Naval
13          Magazine Indian Island is in a constant state of flux.  The difficulty
            of monitoring and protecting such explosives from misuse is
14          concomitantly more complex.

15   Whitbred Dec. at ¶ 15.  To better understand Commander Whitbred concerns, it is helpful to

16   review the attached Map of Naval Magazine Indian Island, which reveals numerous bunkers

17   scattered throughout the base, connected by a system of streets, and a large docking facility.

18   Ex. 3.  Thus, the security concerns regarding the vulnerability of a working arsenal such as

19   Naval Magazine Indian Island raise entirely different problems from those associated with the

20   operation of a Trident submarine base.

21          Commander Whitbred explains that ESQD Arcs are part of an overall safety program

22   which is designed to maximize safety and minimize unintended consequences.  Should an

23   accident occur, the safety program is designed to minimize and isolate any adverse effects.  In

24   particular, Whitbred explains that the safety program is designed to store and handle explosives

25   in such a way that a fire or an explosion in one area will not set off an explosion in another area.

26   "This sort of chain reaction is known as a 'sympathetic detonation' and is a concept that DOD

27   has studied for years.  Of course, a terrorist or other lawbreaker would employ this same concept

28   (in reverse) to create maximum damage with minimum outlay of effort.  It is one of the reasons

United States' Motion for
Summary Judgment  –  7
(CV-06-01301-JCC)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON  98101-1271
(206) 553-7970

we are so careful about releasing data, while we are focused on safety, others are not." Whitbred

Dec. at ¶ 16,

In other words, ESQD Arcs are precisely the type of information which could assist

terrorists, other criminals, or adversaries in determining which attacks, sabotage, or other

security breaches would result in the maximum loss of life and damage to property.  Whitbred

concludes as follows:

> I support the right to freedom of information about the military as an essential component of the oversight and control of our government by its citizens.  However, based on my training and experience, I believe strongly that release of the sensitive ESQD information involved in this case would jeopardize the safety and security of the storage, transportation and loading of ammunition and explosives; that it would create a serious threat to the base and its surrounding communities, and it would do little or nothing to promote the purpose of democratic oversight which is at the heart of the Freedom of Information Act.

Whitbred Dec. at ¶ 18.  The strong opposition of Commander Whitbred to the release of this

information, an opinion which is shared by his predecessor in command at Naval Magazine

Indian Island, as well as other Navy experts who have considered this matter, are the reason why

the Navy has taken the position in this case that the release of the ESQD Arcs for Naval

Magazine Indian Island "could reasonably be expected to endanger the life or physical safety of

any individual",[6] and are the basis why the records here should be withheld under FOIA

Exemptions 7(F) and 2.

## ARGUMENT AND AUTHORITIES

I.    Summary Judgment is Appropriate in FOIA Cases.

FOIA was enacted to pierce the veil of administrative secrecy and to open agency action to

the light of public scrutiny.  Department of the Air Force v. Rose, 425 U.S. 352, 361 (1976).  See

also Bowen v. FDA, 925 F.2d 1225, 1226 (9th Cir. 1991).  However, the public's interest in

government information under FOIA is not absolute---"there are statutory exemptions that

prohibit the government from disclosing certain information."  Bowen, 925 F.2d at 1226; see 5

USC § 552(b)(1)-(9).  "These exemptions reflect Congress' recognition that the Executive

---

[6] Attorney General's Memorandum on the 1974 Amendments to the Freedom of Information Act, at http://www.usdoj.gov/04foia/74agmemo.htm.

United States' Motion for
Summary Judgment – 8
(CV-06-01301-JCC)

1  Branch must have the ability to keep certain types of information confidential." Hale v. U.S.

2  Department of Justice, 973 F.2d 894, 898 (10th Cir. 1992), vacated on other grounds, 509 U.S.

3  918 (1993).

4      Although the agency has the burden of justifying non-disclosure of information in a FOIA

5  action, the agency may meet its burden by submitting affidavits that "contain reasonably detailed

6  descriptions of the documents and allege facts sufficient to establish an exemption [and] the

7  district court need look no further." Lewis v. IRS, 823 F.2d 375, 377-78 (9th Cir. 1987).

8  Consequently, summary judgment is routinely granted in FOIA cases on the basis of agency

9  affidavits.  If the affidavits provide specific information sufficient to place the documents within

10  the claimed exemption, if this information is not contradicted in the record, and if there is no

11  evidence in the record of agency bad faith, then summary judgment is appropriate.  Gardels v.

12  Central Intelligence Agency, 689 F.2d 1100, 1104-05 (D.C. Cir. 1982); Assassination Archives

13  and Research Center v. Central Intelligence Agency, 177 F. Supp. 2d 1, 5-6 (D.D.C. 2001);

14  Windels, Marx, Davies & Ives v. Department of Commerce, 576 F. Supp. 405, 409-11 (D.D.C.

15  1983).

16      Under such circumstances, granting summary judgment in favor of the government is in

17  accordance with congressional intent that courts give agency affidavits substantial weight in

18  recognition of the agency's expertise, particularly in cases concerning questions of national

19  security. Gardels, 689 F.2d at 1104-05; Assassination Archives and Research Center, 177 F.

20  Supp. 2d at 5-6.  Significantly, the test is not whether the court agrees with the agency's

21  evaluation of the need to protect the information from disclosure, but rather whether the agency's

22  judgment is sufficiently specific, reasonable and plausible and made in good faith. Gardels, 689

23  F.2d at 1105.  As one court has observed, "In FOIA cases it has been held that disputes regarding

24  the risks created by disclosure, inherently a matter of some speculation, are not sufficient to

25  create a triable issue of fact when the agency possessing relevant expertise has provided

26  sufficiently detailed affidavits to justify its position that disclosure would pose significant risks."

27  Windels, Marx, Davies & Ives, 576 F. Supp. at 410.

28

United States' Motion for
Summary Judgment  −  9
(CV-06-01301-JCC)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1    The Whitbred Declaration demonstrates how the release of the information could harm

2    personnel and property at Naval Magazine Indian Island, threaten the safety of communities near

3    the installation and risk circumvention of the law.  Under established FOIA case law, the

4    information is protected from public disclosure under Exemption 7(F), pertaining to information

5    compiled for law enforcement purposes where the release of the information could reasonably be

6    expected to endanger the life or physical safety of individuals.  For the same reason, the

7    information is protected under Exemption 2, which covers records related solely to the internal

8    practices of an agency.

9        II.    The Navy Properly Withheld Information Under Exemption 7(F).

10    The Navy respectfully submits that the withheld information is protected from disclosure

11    under Exemption 7(F) of the FOIA.  Exemption 7(F) contains a two part test:  it protects 1)

12    "records or information compiled for law enforcement purposes," 2) where release of the records

13    or information ". . . could reasonably be expected to endanger the life or physical safety of any

14    individual."  5 USC § 552(b)(7)(F).

15        A.    The Threshold Requirement
              Explosive Safety Data is Compiled for Law Enforcement Purposes.
16

17        1.    The Threshold Requirement

18    Information withheld under Exemption 7 must be "compiled for law enforcement purposes"

19    as a threshold requirement.   Rosenfeld v. Department of Justice, 57 F.3d 803, 808 (9th Cir.

20    1995), cert. dismissed, 516 U.S. 1103 (1996).[7]  The Ninth Circuit requires examination of the

21    agency itself to determine if the agency exercises a law enforcement function and has stated the

22    standard for meeting the threshold requirement in the following way:

23            The term "law enforcement purpose" has been construed to require an
              examination of the agency itself to determine whether the agency may
24            exercise a law enforcement function.  An agency which has a clear law
              enforcement mandate, such as the FBI, need only establish a "rational
25            nexus" between enforcement of a federal law and the document for which
              an exemption is claimed.  However, an agency which has a "mixed"

26

27        [7]  Prior to the 1986 FOIA amendments, Exemption 7 applied only to "investigatory records compiled
      for law enforcement purposes."  The change from "investigatory records" to "records or information"
28    "broadened the scope of Exemption 7's threshold requirement."  Hopkinson v. Shillinger, 866 F.2d 1185,
      1222 n.27 (10th Cir 1989), on rehearing, 888 F.2d 1286 (10th Cir. 1989), overruled on other grounds,
      Sawyer v. Smith, 497 U.S. 227 (1990).

United States' Motion for
Summary Judgment  −  10
(CV-06-01301-JCC)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON  98101-1271
(206) 553-7970

1   function, encompassing both administrative and law enforcement functions,
    must demonstrate that it had a purpose falling within its sphere of
2   enforcement authority in compiling the particular document.

3   Church of Scientology v. Department of the Army, 611 F.2d 738, 748 (9th Cir. 1980).

4        In Living Rivers v. United States Bureau of Reclamation, 272 F. Supp. 2d 1313, 1318 (D.

5   Utah 2003) the Court held that the Bureau of Reclamation was a "mixed agency" for purposes of

6   exemption 7(F).  In Living Rivers, the plaintiff sought disclosure of inundation maps prepared

7   by the Bureau of Reclamation for the areas below two dams.  The inundation maps requested

8   showed which areas would be flooded in the event of a dam failure.  Id at 1315.  The court found

9   that the Bureau of Reclamation possessed both a law enforcement function and an administrative

10  function.  The court found that Congress had "provided the Bureau of Reclamation with express

11  law enforcement authority" to "maintain law and order and protect persons and property within

12  Reclamation projects and on Reclamation lands."  Id at 1318.

13       In Living Rivers, the Bureau of Reclamation argued "that materials compiled for purposes

14  of protecting against and preventing violations of law, as opposed to only the more traditional

15  law enforcement functions of investigation and prosecution," are exempted by Exemption 7(F)

16  of FOIA.  The court agreed.  Id at 1318.  Moreover, in Living Rivers the Bureau of Reclamation

17  contended that it "uses the inundation maps to develop its Emergency Action Plans and to

18  protect and alert potentially threatened people in the vicinity of the dams."  Id at 1319.

19       It is not relevant why the information was originally compiled by the agency.  The U.S.

20  Supreme Court has held that "the wording of the phrase under scrutiny is simple and direct:

21  "compiled for law enforcement purposes."  The plain words contain no requirement that

22  compilation be effected at a specific time.  The objects sought merely must have been

23  "compiled" when the Government invokes the Exemption."  John Doe Agency v. John Doe

24  Corp., 493 U.S. 146 (1989).  Once the documents sought are assembled for law enforcement

25  purposes "all such documents qualify for protection under exemption 7 regardless of their

26  original source."  Kansi v. United States Department of Justice, 11 F. Supp. 2d 42, 44 (D.D.C.

27  1998).

28

United States' Motion for
Summary Judgment – 11
(CV-06-01301-JCC)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

2.     <u>The Navy is a "Mixed" Agency</u>
        <u>Possessing Both an Administrative Function and a Law Enforcement Function</u>.

As with the Bureau of Reclamation, Congress has given the Navy express law enforcement authority to maintain law and order and protect persons and property over which the United States has jurisdiction.[8]  The Navy exercises jurisdiction over all property it manages, in which the United States has either exclusive or concurrent legislative jurisdiction.  The United States has concurrent jurisdiction over Naval Magazine Indian Island.  <u>See</u>, Whitbred Dec. at ¶ 3.

In addition to federal legislative jurisdiction, the installation commander retains ultimate authority to protect the base from threats under the Internal Security Act of 1950.  <u>See</u>, 50 USC § 797; <u>United States v Floyd</u>, 477 F.2d 217 (1973, CA10), <u>cert</u> <u>denied</u> (1973).  Finally, the military maintains jurisdiction over military personnel at all times and all places, under the Uniform Code of Military Justice, 10 USC Chapter 47.  The Director of the Naval Criminal Investigative Service is the senior Navy official for all criminal investigations, counterintelligence and security within the Department of the Navy.[9]  Finally, the Navy has its own police force, security force, fire department, emergency medical force, emergency response personnel, explosive safety experts and law enforcement investigative arm: all of which it employs at Naval Magazine, Indian Island.  <u>See</u> Whitbred Dec. at ¶ 3.  Thus, the Navy has both civil and criminal jurisdiction over Naval Magazine, Indian Island.

---

[8] See, 18 USC §1382 (which makes unauthorized entry onto any military, naval or Coast Guard reservation, post, fort, arsenal, yard, station, or installation a crime); 10 USC § 7480 (which authorizes the Navy and Marine Corps agents to serve warrants and make arrests); 28 CFR Part 60 (authority of federal law enforcement officers to request issuance of a search warrant); 10 USC § 1585 (which authorizes civilian officers and employees of the Department of Defense to carry firearms or other appropriate weapons while assigned investigative duties); 10 USC § 1585a (which authorizes special agents of the Defense Criminal Investigative Service to execute warrants and make arrests), 5 USC § 8331(20) (which defines "law enforcement officer", including reference to Navy employees);  Public Law 99-145 § 1223 (which directed the Secretary of the Navy to prescribe regulations providing the Naval Criminal Investigative Service with authority to initiate and conduct criminal investigations); 10 USC § 801- 950 (Uniform Code of Military Justice); 40 USC §3112 (federal jurisdiction over lands) 18 USC § 641 (destruction of public property); 18 USC § 1361 (injury to government property); 18 USC § 1363 (government building or property in special maritime jurisdiction); 18 USC § 2155 (destruction of national defense materials, premises or utilities) and 18 USC §§ 3261 - 3266 (which even allows for extraterritorial Armed Forces criminal jurisdiction).

[9] Secretary of the Navy Instruction 5430.107; 28 December 2005 (Naval Criminal Investigative Service).

United States' Motion for
Summary Judgment – 12
(CV-06-01301-JCC)

3.    The Purpose of the Compilation is within the Navy's Authority
to Protect Persons and Property.

The protective purpose of the compilation of the withheld information is within the Navy's authority to protect government personnel and property.  This authority is derived from Congress through statutes which have granted the Secretary of Defense "authority, direction, and control over" its installations.  See, 10 USC § 113(b).  "The Secretary of the Navy is responsible for, and has the authority necessary to conduct, all affairs of the Department of the Navy."  See, 10 USC § 5013(b).  Congress has also provided that, in carrying out their responsibilities, the Secretary of Defense and the Secretary of the Navy have authority to "prescribe regulations for the custody, use, and preservation of property."  5 USC § 301.  In addition, the Navy derives authority to maintain law and order on its property from the President.

Pursuant to their authority from Congress and the President, DoD and the Navy have issued a number of regulations that provide for and direct the protection of government property and personnel.  These regulations regulate the security of DoD Installations and Resources,[10] and they establish general policies for the security of personnel and installations.[11]  Commanding officers also have general responsibility for the security of matters within their commands.[12]

---

[10] DoD Directive 5200.8, "Security of DoD Installations and Resources," http://www.dtic.mil/whs/directives/corres/html/52008.htm, states in section 3: "It is DoD policy that . . . [m]ilitary installations, property, and personnel be protected and that applicable laws and regulations be enforced," and "[t]he authority of a DoD installation commander to take reasonably necessary and lawful measures to maintain law and order and to protect installation personnel and property has long been recognized."

[11] DoD Directive 5200.8 authorizes the publication of DoD 5200.8-R, "Physical Security Program," http://www.dtic.mil/whs/directives/corres/html/52008r.htm. The objectives of this regulation are stated in section C1.3; they include: "Establish general policy for the security of personnel and installations, military operations, and certain assets," "Provide realistic guidance . . . for Commanders to protect personnel, installations, operations & assets from typical threats," and "Reduce the loss, theft, or diversion of, and damage to DoD assets, thereby ensuring that warfighting capability is maintained."

[12] OPNAV Instruction 5530.14D, "Navy Physical Security,"  http://neds.nebt.daps.mil/553014.htm, states in paragraph 6.1: "Commanding officers of installations, ships, squadrons & units shall implement the security & law enforcement policies & procedures contained [herein] and Section 797 of Title 50 U.S. Code."

United States' Motion for
Summary Judgment – 13
(CV-06-01301-JCC)

1   Regulations concerning terrorism also provide for and direct the protection of property,[13] and

2   authorize the implementation of broad security measures to protect installations, and military

3   personnel and their families from terrorist threats.  In addition, the violation of a military

4   regulation or order that protects property is a crime.[14]  The various Washington State criminal

5   statutes that protect property and persons are also applicable to property and personnel at Naval

6   Magazine Indian Island.[15]  Each of these legal requirements is a "law" within the meaning of

7   "law enforcement" in Exemption 7.  The above statutes and regulations, and the inherent power

8   of commanding officers to maintain law and order within their command, make clear that the

9   Navy's purpose in compiling the withheld information was within its authority to protect persons

10  and property.

11          4.      The Compilation Was for "Law Enforcement Purposes"
                    Because It Served to Prevent the Violation of Statutes and Regulations.

12          Naval Magazine Indian Island compiled explosive safety information (including ESQD

13  Arcs), and uses that information to meet its explosive safety, emergency response, physical

14  security and law enforcement obligations.  As with the inundation maps in Living Rivers, Naval

15  Magazine Indian Island has both compiled and actively utilized this information for the

16  "purposes of protecting against and preventing violations of law" including to protect potentially

17  threatened people within or near the base.

18          The Navy originally generated the explosive safety data for the purpose of analyzing the

19  safety of the handling and storage of ordnance, ammunition and other explosives and ensuring

20

21          [13] See DoD Directive 2000.12, "DoD Antiterrorism (AT) Program," where it states in section 4.1 that
        "[t]he DoD components and the DoD Elements and Personnel shall be protected from terrorist acts."
22      Section 4.2 of the Directive states that the following is DoD policy:

23              The Commanders at all levels shall have the responsibility and authority to enforce
                appropriate security measures to ensure the protection of DoD Elements and Personnel
24              subject to their control and shall ensure the AT awareness and readiness of all DoD
                Elements and Personnel (including dependent family members) assigned or attached.
25              Commanders must ensure appropriate AT protection and readiness of DoD Elements and
                Personnel while pursuing mission accomplishment.
26              http://www.dtic.mil/whs/directives/corres/html/200012.htm.

27          [14] See 50 USC §797.

28          [15] State criminal law is applicable to offenses committed at Naval Magazine Indian Island. 18 USC
        §13.

United States' Motion for
Summary Judgment – 14
(CV-06-01301-JCC)

1   that appropriate safety measures are taken.  Whitbred Dec. at ¶¶ 10, 16.  The Navy has gathered

2   and used the withheld information not only for the purpose of identifying and addressing safety

3   hazards, but also for the purpose of identifying and addressing security issues.  In particular, the

4   Navy has used the withheld information to make improvements that enhance both the safety and

5   the security of the base.  Especially in light of the explosive nature and the variety of the items

6   stored, it is evident that the ultimate purpose for the compilation of the withheld information is

7   the protection of the ordnance itself, the base, other property, and people from damage, loss,

8   death, or injury that could occur from an incident, accident, or breach of security.  Whitbred Dec.

9   at ¶¶ 3, 9 & 13).

10       The compilation of the withheld information helped the Navy identify, correct and protect

11  against deficiencies or vulnerabilities of the Naval Magazine Indian island.  This action thus

12  served to prevent the misuse, destruction, damaging, sabotage, or theft of the weapon systems or

13  their components, and thereby served the purpose of preventing the crimes and other violations

14  prohibited by the laws described above.  This prophylactic purpose of the compilation is a "law

15  enforcement purpose" within the meaning of Exemption 7.  As the Attorney General stated in

16  1975 concerning the meaning of Exemption 7: "Law enforcement" includes not merely the

17  detection and punishment of law violation, but also its prevention."[16]  Thus Exemption 7 has

18  been applied in a variety of contexts to protect information compiled for the purpose of

19  preventing violations of the law.  See Living Rivers, 272 F. Supp.2d at 1318-21 (holding that, in

20

---

21       [16] The "law" to be enforced within the meaning of Exemption 7 includes both civil and criminal law.
    See Church of Scientology International v. Internal Revenue Service, 995 F.2d 916, 919 (9th Cir. 1993)
22  (citing with approval the statement in Center for Nat'l Policy Review on Race & Urban Issues v.
    Weinberger, 502 F.2d 370, 373 (D.C. Cir. 1974) that "civil as well as criminal law enforcement
23  activities are within the purview" of Exemption 7); Rural Housing Alliance v. Department of
    Agriculture, 498 F.2d 73, 81 n. 46 (D.C. Cir. 1974) ("The character of the statute violated would rarely
24  make a material distinction, because the law enforcement purposes protected by Exemption 7 include
    both civil and criminal purposes . . . .")  See also Attorney General's Memorandum of the 1986
25  Amendments to the Freedom of Information Act, p. 8, n.13, http://www.usdoj.gov/oip/86agmemo.htm
    ("Of course, a 'law enforcement purpose' under Exemption 7 includes the enforcement of civil as well
26  as criminal laws, as well as statutes authorizing administrative (i.e., regulatory) proceedings." (Citations
    omitted.).  Exemption 7 also applies to information compiled to enforce state or local law.  See
27  Hopkinson v. Shillinger, 866 F.2d 1185, 1222 n. 27 (10th Cir 1989), on rehearing 888 F.2d 1286 (10th
    Cir. 1989) overruled on other grounds, Sawyer v. Smith, 497 U.S. 227 (1990); Shaw v. FBI, 749 F.2d
28  58, 64-65 (D.C. Cir. 1984); Wojtczak v. United States Dep't of Justice, 548 F. Supp. 143, 146-48
    (E.D.Pa. 1982).

United States' Motion for
Summary Judgment – 15
(CV-06-01301-JCC)

1  light of Bureau of Reclamation's authority to "maintain law and order and protect persons and

2  property within Reclamation projects and on Reclamation lands," inundation maps showing

3  flooding that would be caused by a dam failure that might result from a terrorist attack were

4  compiled for "law enforcement purposes"); U.S. News & World Report v. Department of the

5  Treasury, No. 84-2303, 1986 U.S. Dist. LEXIS 27634, at *2-10 (D.D.C. Mar. 26, 1986) (holding

6  that, in light of the Secret Service's function of protecting the President, procurement

7  information concerning the specifications, equipment, parts, weight, product numbers, and

8  component-part prices of armored limousines for the protection of the President were compiled

9  for "law enforcement" purposes); Moorefield v. U.S. Secret Service, 611 F.2d 1021, 1024 (5th

10  Cir. 1980) (holding that information prepared to help the Secret Service fulfill its duty to protect

11  the lives and safety of the President, his family, and other persons were compiled for "law

12  enforcement purposes"); Librach v. Federal Bureau of Investigation, et al, 587 F.2d 372, 373

13  (8th Cir. 1978), cert denied (1979) (assuming that the Marshal's Service's efforts to protect

14  witnesses was a law enforcement function, and affirming application of Exemption 7 to records

15  pertaining to the relocation of a witness whose disclosure "would jeopardize the effectiveness of

16  the Witness Security Program"); Church of Scientology of California v. Department of the Air

17  Force, No. 76-1008, 1978 U.S. Dist. LEXIS 18428, *8-9 (D.D.C. Apr. 12, 1978) (citing

18  Attorney General's statement that "'law enforcement' includes not merely the detection and

19  punishment of law violation, but also its prevention" and thus holding that an Air Force report of

20  investigation and memorandum were "compiled for law enforcement purposes"); Zamnik v.

21  Department of State, 1 GDS ¶ 79,114 (D.D.C. 1979) (holding that Foreign Affairs Manual,

22  which contained methods for identifying and notifying Secret Service of individuals who may

23  pose threat to government officials, was properly withheld under Exemption 7(E)) (AR at Tab

24  29). See also United States v. Eastern Airlines, 792 F.2d 1560, 1561 n.1 (11th Cir. 1986)

25  (suggesting that air carrier security programs were protected by Exemption 7(E)).

26      These cases demonstrate that the purpose of the compilation of the withheld information is

27  within the Navy's authority to take action to protect government property and personnel, and that

28  this authority and its exercise through the compilation of the withheld information are for "law

United States' Motion for
Summary Judgment – 16
(CV-06-01301-JCC)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1   enforcement," because they serve to prevent the violation of laws that protect government

2   property and personnel.  In this context, the Court should provide some deference to Commander

3   Whitbred's conclusions with respect to the law enforcement implications of the disclosure of the

4   information in this case.  See Center for National Security Studies v. U.S. Dept of Justice, 331

5   F.3d 918, 927-928 (D.C. Cir. 2000).

6       B.   Release Of The Records Could Reasonably Be Expected
             To Endanger Persons or Property.

7

8    When the threshold requirement of Exemption 7 is met, the court must then determine that

9   the "release of the records or information "could reasonably be expected to endanger the life or

10  physical safety of any individual." 5 U.S.C. §552(b)(7)(F).  In his Declaration, Commander

11  Whitbred states that he has no doubt that the release of the records in question could reasonably

12  be expected to endanger the life or physical safety of individuals both at Naval Magazine Indian

13  Island, as well as others residing near the base at communities such as Hadlock and Nordland.

14  Whitbred Dec. at ¶ 18.  Also see attached Map of Indian Island and Surrounding Communities.

15  Ex. 4.  More specifically, Commander Whitbred points out how a lay person could use this

16  information with only a rudimentary knowledge of mathematics to determine the precise location

17  of ordnance magazines, the types of items stored in them, which locations to target for maximum

18  damage to personnel, critical infrastructure and disruption of loading and off-loading of ships,

19  the mission capability of the base, the battle group capability and operational sustainability and

20  the location of personnel and the precise numbers of personnel required to load and offload a

21  ship.

22      As Commander Whitbred points out, ESQD Arcs and explosives standards are designed to

23  provide the inhabitants of nearby communities, the personnel of Department of Defense shore

24  activities and adjacent public and private property reasonable safety from serious injury or

25  destruction from fires or explosions and to minimize the loss of valuable ammunition stores

26  through fires or explosions.  In the wrong hands, however, this information could be used to

27  harm persons or property or to threaten the security of the installation, the personnel on the

28  installation and nearby communities.  Whitbred Dec. at ¶¶ 8 & 9.  The ultimate purpose of the

    explosives safety program is to protect property and people from harm that could occur from an

United States' Motion for
Summary Judgment – 17
(CV-06-01301-JCC)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1    incident, accident or breach of security, and part of the Commanding Officer's job is to safeguard

2    sensitive information that could be used to create a security breach.  See, Whitbred Dec. at ¶¶ 1,

3    5 and 13.

4            As Whitbred explains, ESQD Arcs were used at Naval Magazine Indian Island to design,

5    array, and construct ammunition storage facilities, and to organize ammunition operations for

6    risk mitigation and enhanced safety.  While all ESQD Arcs can be "reversed engineered" to

7    create targets of opportunity, those prepared for the base at Indian Island would reveal more than

8    other ESQD Arcs would about the particular ammunition, explosive or weapons system

9    maintained at that location, and are of a higher level of sensitivity than ESQD Arcs prepared for

10   other purposes.  Whitbred Dec. at ¶ 12.  Such information could assist terrorists, other criminals,

11   or adversaries in determining which attacks, sabotage, or other security breaches would result in

12   the maximum loss of life and damage to property.  Whitbred Dec. at ¶ 16.  Given the dangerous

13   nature of the items stored at Naval Magazine Indian Island, and the current worldwide threat of

14   terrorism, the risk to human life and physical safety from a release of the ESQD Arcs is real,

15   obvious, and significant, and well within reasonable expectations.  See Living Rivers, at 1321-22

16   (holding that inundation maps were protected under Exemption 7(F), because release of maps

17   showing flooding resulting from dam failure would increase the risk to human life and safety

18   from terrorist attack.  Consequently, the release of the information would meet the standard

19   under Exemption 7(F), in that it "could reasonably be expected to endanger the life or physical

20   safety of any individual."[17]  As noted above, the government's assessment of danger under

21   Exemption 7(F) is entitled to deference.  See Living Rivers, at 1321, and cases cited therein.  In

22   conclusion, then, the Navy respectfully submits that the ESQD Arcs should be protected from

23   disclosure under Exemption 7(F).

24

25

26

27

28          [17] Attorney General's Memorandum on the 1974 Amendments to the Freedom of Information Act, at
     http://www.usdoj.gov/oip/74agmemo.htm.

United States' Motion for
Summary Judgment – 18
(CV-06-01301-JCC)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

III.   The Explosive Safety Information Also Is Properly Withheld under Exemption 2 Because it Constitutes "Law Enforcement Materials," the Release of Which Would Risk Circumvention of Law and Regulation.

A second basis for the withholding of the materials in this case is FOIA's Exemption 2.  Exemption 2 protects from disclosure "matters that are . . . related solely to the internal personnel rules and practices of an agency."  5 USC §552(b)(2). The Supreme Court in Department of Air Force v. Rose, 425 U.S. 352 (1976), interpreted Exemption 2 in light of FOIA's legislative history and indicated that Exemption 2 might be applicable to information "where disclosure may risk circumvention of agency regulation." Dirksen v. Department of Health & Human Services, 803 F.2d 1456, 1458 (9th Cir. 1986), citing Rose, 425 U.S. at 369.

The Ninth Circuit, in reliance on the Supreme Court's decision in Rose, has found that  "law enforcement materials, disclosure of which may risk circumvention of agency regulation," are properly withheld under Exemption 2.  Hardy v. Bureau of Alcohol, Tobacco and Firearms, 631 F.2d 653, 655-57 (1980).  Dirksen v. Department of Health & Human Servs., 803 F.2d 1456, 1458 (9th Cir. 1986).  In Hardy, the Ninth Circuit held that Exemption 2 covered a training manual for federal agents on how to conduct raids and searches.  631 F.2d at 657.  In Dirksen, the Ninth Circuit recognized that the definition of "law enforcement materials" included processing guidelines for Medicare claims. 803 F.2d at 1458-59.  The Court ruled that the guidelines would lose their "utility" if released to the public because prospective claimants would use the guidelines to "fit" their respective claims into the automatically granted category. Id.

The materials found to meet Exemption 2 in Hardy and Dirksen are commonly referred to as "high 2" information, while the more trivial internal personnel materials are referred to as "low 2" information.  Crooker v. Bureau of Alcohol, Tobacco & Firearms, 670 F.2d 1051, 1061 (D.C. Cir. 1981) (en banc).  The Crooker court formulated a two-part  test for "high 2" exempt information:  if a document is "predominantly internal" and if its disclosure would significantly risk circumvention of agency regulation or statute, it is exempt from disclosure under Exemption 2.  Id. at 1073-74.  Information is "predominantly internal" if it was developed

United States' Motion for
Summary Judgment – 19
(CV-06-01301-JCC)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

predominantly for internal use and does not constitute "secret law" – that is, it does not purport to regulate conduct among members of the public or set standards to be followed by agency personnel in deciding whether to take actions affecting members of the public.  See Crooker, 670 F.2d at 1073-74.  For instance, in Maricopa Audubon Society v. U.S. Forest Service, 108 F.3d 1082, 1086 (9th Cir. 1997), the Ninth Circuit refused to find that the Forest Service's northern goshawk nest site information constituted law enforcement materials.  In holding that Exemption 2 did not apply, the court stated that "[t]he requested information does not tell the Forest Service how to catch lawbreakers; nor does it tell lawbreakers how to avoid the Forest Service's enforcement efforts." Id.  See also, Coastal Delivery, 272 F. Supp. 2d at 965.  By contrast, in this case, the information at issue the location and quantity of ordnance which, if released, would assist lawbreakers or adversaries in avoiding the safety and security measures that the Navy has in place to meet its statutory and regulatory law enforcement responsibilities to protect life and property.

Accordingly, for the same reasons discussed above that the ESQD Arcs would by covered by Exemption 7(F), they would also qualify as high 2 information.  The Navy has established that the withheld information has law enforcement purposes – namely, that the information has been used to enhance the safety and security of the Naval Magazine Indian Island.  The withheld information, if released, would provide a blueprint for terrorists in sabotaging the Naval Magazine Indian Island.  Indeed, allowing release of the aircraft hazard information and the facility and equipment drawings, for example, would assist terrorists in planning the same type of attack that occurred on September 11, 2001.  Releasing the information would, therefore, allow terrorists or other potential enemies to circumvent the Navy's law enforcement responsibilities in protecting against such attacks.  If released, the redacted information would thus lose its "utility" in serving to enhance the safety and security of Naval Magazine Indian Island.  Dirksen, 803 F.2d at 1459.16

The Navy has thus reasonably explained through Commander Whitbred's declaration that the withheld information involves law enforcement materials the release of which would risk circumvention of law and regulation.  Hardy, 631 F.2d 657-58 (in remanding to the district court,

United States' Motion for
Summary Judgment  –  20
(CV-06-01301-JCC)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1   Ninth Circuit stated that the withheld information should be exempt from disclosure if agency

2   affidavit reasonably explains that the information involves law enforcement material, the

3   disclosure of which would circumvent agency regulation).  See Buffalo Evening News v. U.S.

4   Border Patrol, 791 F. Supp. 386, 393 (W.D.N.Y. 1992) (emphasizing that agency need not show

5   actual circumvention of law, merely risk of circumvention of law).  See also Center For National

6   Security Studies, 331 F.3d 927-928.  (in applying "substantial weight" deference standard to an

7   affidavit in support of an Exemption 7 issue that involved national security, court stated

8   "[j]udicial deference depends on the substance of the danger posed by disclosure--that is, harm

9   to the national security--not the FOIA exemption invoked").

10       Accordingly, for the reasons discussed here and under the Exemption 7 section above, the

11   information is properly exempt from disclosure under Exemption 2.  See, Coastal Delivery Corp.

12   v. Customs Service, 272 F. Supp. 2d 958, 965 (CD Calif. 2003) (court held that because agency

13   had established that the withheld information had a law enforcement purpose under Exemption

14   7, the information could also be withheld under Exemption 2 under "the Ninth Circuit test" for

15   "high 2" information).

16                             **CONCLUSION**

17       For all the foregoing reasons, defendant Navy respectfully requests that the Court grant the

18   Navy's motion for summary judgment, and enter judgment in favor of the Navy on the grounds

19   that the explosive safety information withheld is exempt from disclosure under FOIA.

20   DATED this March 16, 2007.

21

                                         Respectfully submitted,

22

23                                         JEFFREY C. SULLIVAN
                                        United States Attorney

24                                         Western District of Washington

25

26

27                                 *s/Peter Winn*
                                        PETER A. WINN
                                      Assistant United States Attorney

28                                       Attorney for Defendant
                                      peter.winn@usdoj.gov

United States' Motion for
Summary Judgment  –  21
(CV-06-01301-JCC)

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101-1271
(206) 553-7970

1
<u>CERTIFICATE OF SERVICE</u>

2
     I HEREBY CERTIFY that on this date I electronically filed the foregoing Defendant's

3
Answer with the Clerk of the Court using the CM/ECF system, which will send notification of

4
such filing to the following CM/ECF participants:

5
David Mann
Gendler & Mann

6
1424 Fourth Ave., Suite 1015
Seattle, WA 98101

7
mann@gendlermann.com

8
DATED March 16, 2007.

9

10
                             *s/Peter Winn*
                             Peter A. Winn

11
                             Office of the United States Attorney
                             Seattle, Washington
                             Fax: 206-553-4073

12
                             E-mail: peter.winn@usdoj.gov

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28